Alvin WILLIAMS, Plaintiff,

v.

GENERAL MILLS, INC., Defendant.

No. 95 C 4199.

United States District Court,
N.D. Illinois,
Eastern Division.

June 3, 1996.

Ralanda Webb, Webb & Associates, P.C., Chicago, Illinois, for Plaintiff.

Richard E. Liberman, Kimberly G. Metrick, Christian M. Poland, Ross & Hardies, P.C., Chicago, Illinois, for Defendant.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Alvin Williams sues General Mills, Inc. ("General Mills") for terminating his employment because of race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 ("§ 1981"). General Mills moves for summary judgment.

### BACKGROUND

The following facts are uncontested unless otherwise noted. Williams, an African American male, resides in Chicago, Illinois. De-

fendant's Local Rule 12(M) Statement ("Def. 12(M)") and Plaintiff's Local Rule 12(N) Statement ("Pl. 12(N)") ¶ 1. General Mills is a corporation doing business in West Chicago, Illinois. *Id.* at ¶ 2. General Mills hired Williams in 1979 in the West Chicago plant's packaging department. In 1984, Williams transferred to the cereal processing department. *Id.* at ¶ 5.

### I. *1986 SEXUAL HARASSMENT CHARGE*

In June 1986, a General Mills female hourly employee, April Love, reported to her supervisor that Williams made lewd remarks to her and forcibly kissed her. Def. 12(M) ¶ 6; Def.Ex. E, Bate stamp documents D053, D061.[1] General Mills' human resources department was informed and immediately began an investigation in accordance with its sexual harassment policy. Def. 12(M) ¶ 6; D049–50, D053, D077. Williams, represented by his union, met with the human resources manager investigating the matter and denied harassing Love. Def. 12(M) ¶ 6; D049–50. Williams does not contest Def. 12(M) ¶ 6. *See* Pl. 12(N) ¶ 6. Rather, Williams' statement addresses the merit of Love's allegations: Williams admits having conversations with Love, but denies that he was lewd or that he kissed her. *Id.;* Deposition of Alvin Williams ("Williams Dep.") at 88–89.

Love reported that over a period of time, Williams said "dirty things" to her. Def. 12(M) ¶ 7; D061. On one occasion, she claims Williams grabbed her arms and hands, held her, and started kissing her. Def. 12(M) ¶ 7; D061–63. On other occasions, he allegedly hugged her and said "ugly" things like, "I want to get down your pants." Def. 12(M) ¶ 7; D072. Williams purportedly threatened to follow Love home. Def. 12(M) ¶ 7; D063. Love stated she was frightened of Williams. *Id.* Williams does not contest that Def. 12(M) ¶ 7 reflects statements made to the human resources department during its investigation. Pl. 12(N) ¶ 7. Williams denies hugging or threatening Love or saying he wanted to get down her pants,

---

1. Bate stamp documents are General Mills business records produced during discovery and are referred to as, "D ____."

and was unaware Love was frightened of him. *Id.;* Williams Dep. at 88–89.

A second female hourly employee, Willie Robinson, told the human resources investigator that Williams assaulted her in the women's bathroom at the plant. Def. 12(M) ¶ 8; D067–71. Robinson stated that Williams indicated he wished to enter the women's bathroom to clean it while she was combing her hair. Def. 12(M) ¶ 8; D067–68. Robinson claimed Williams ignored her request that he wait until she finished, walked into the bathroom, approached her and grabbed her breasts. Def. 12(M) ¶ 8; D068. As she attempted to push him away, she fell to the floor. *Id.* As they struggled, Williams allegedly called Robinson a "bitch" and a "whore." Def. 12(M) ¶ 8; D069. Williams admits Def. 12(M) ¶ 8 reflects Robinson's version of the event as reported to the human resources investigator, but denies the incident occurred in the manner reported. Pl. 12(N) ¶ 8; Williams Dep. at 68–74.

After Robinson discussed the bathroom incident with other female employees, the female employees began warning each other about Williams. Def. 12(M) and Pl. 12(N) ¶ 9; D052. General Mills contends Robinson told the investigator that in the course of Williams' regular duties in the plant, he would routinely make obscene comments to women employees, such as, "you have a nice ass." Def. 12(M) ¶ 9; D071. Williams denies he made routine obscene comments and denies General Mills' characterization of Robinson's statement on D071. Pl. 12(N) ¶ 9. The company document reflects that Robinson said that Williams had a "foul mouth," elaborating that, "you know how guys are . . . you know, 'You've got a nice ass'—'You have a nice . . . this.' " D071.

General Mills contends that another female employee, Jan Hayse, told the investigator that Williams had twice brushed up against her breasts. Def. 12(M) ¶ 10; D051–52. Williams denies this statement because the cited document states no contact occurred. Pl. 12(N) ¶ 10; D051. Williams does not contest that Hayse reported that Williams tried to brush against her chest, although he denies attempting to do so. *Id.* Hayse told the investigator that she raised her knee,

pushed Williams away, and told him that if he ever tried to brush against her chest again, she would, "bash in [his] teeth." Def. 12(M) and Pl. 12(N) ¶ 10; D051. Hayse previously told a supervisor that she did not want to work with Williams and she wanted him to leave her alone. *Id.*

A fourth female employee, Christine Kleinwachter, reported that Williams was, "very, very persistent" in asking her out, to the point where she almost threw a shovel at him. Def. 12(M) and Pl. 12(N) ¶ 11; D055–57. Kleinwachter said Williams finally stopped asking her out when he lost interest in her and began asking out another female employee. Def. 12(M) and Pl. 12(N) ¶ 11; D056. Williams contends Kleinwachter reported that other than his persistence, Williams' conduct was similar to other men in the plant. Pl. 12(N) ¶ 11; D055–57. Kleinwachter told the investigator that Williams, "would come around all the time and he would say, 'Hey, baby' and all this stuff. Now, other men in the plant, they do it all the time, but not the way [Williams] did . . . he meant business." D055.

A fifth General Mills female employee, Kathy Garrison, reported to the investigator that Williams was very persistent in asking her for dates, despite her consistent and firm refusals. Def. 12(M) and Pl. 12(N) ¶ 12; D058–60. Garrison stated that she said to Williams, "Alvin, you don't quit, do you," to which he purportedly responded, "No, not until I get what I want," and, "I bet you're hot in bed." Def. 12(M) and Pl. 12(N) ¶ 12; D058. Garrison claimed she told a supervisor that Williams was bothering her to go on a date with him. *Id.* The supervisor instructed Williams to stop his advances. *Id.*

A sixth female employee, Woodsonette Alley, reported to the investigator that Williams asked her out often and that she finally complained to a union representative. Def. 12(M) and Pl. 12(N) ¶ 13; D064–66. Alley stated that she asked her supervisor not to put her in Williams' area. Def. 12(M) and Pl. 12(N) ¶ 13; D065. When the investigator asked her if other women knew about Williams' behavior, Alley responded, "Every lady in this whole factory knows about [Williams'] behavior." *Id.*

General Mills contends various male employees confirmed complaints to the investigator. Def. 12(M) ¶ 14; D072–73. Williams denies this statement, contending that only one male employee, Glen Severin, is mentioned in the cited documents. Pl. 12(N) ¶ 14; D072–73. Williams further notes that Severin explicitly denied personal knowledge of the harassing behavior underlying the complaints. *Id.* He reported that Love and Garrison told him they were harassed by Williams. D072–73.

After completing its investigation, General Mills met with Williams and his union representatives to discuss its findings. Def. 12(M) and Pl. 12(N) ¶ 15. General Mills informed Williams of the sexual harassment charges made against him and asked his response. *Id.* The company advised Williams that it had concluded that there was substance to the allegations and that he violated company policy and possibly federal civil rights laws as well. *Id.* The company informed him that discipline was required and that termination was a definite possibility. *Id.* Williams and the union acknowledged that General Mills' findings constituted just cause for termination, but requested less severe punishment. *Id.*

Based on Williams' expressions of remorse and his public apology to the victims, General Mills agreed not to terminate him provided he met certain conditions: (i) accept and not grieve through his union a two-month unpaid suspension; (ii) submit to psychological counseling; and (iii) receive indefinite probation, which would be reviewed in February 1987 for any further instances of sexual harassment. Def. 12(M) and Pl. 12(N) ¶ 16. Williams agreed to the conditions, as reflected in a memorandum of understanding signed by Williams and the union representative. *Id.*; D079–80. Williams attended seven psychiatric counseling sessions over the next two months. Def. 12(M) and Pl. 12(N) ¶ 17.

## II. *1990 SEXUAL HARASSMENT* [2]

In September 1990, a General Mills female hourly employee, Kim Thurmond, told her supervisor that Williams harassed her all summer and threatened to follow her home. Def. 12(M) and Pl. 12(N) ¶ 18; D129. Thurmond stated that she was terrified. *Id.* Two supervisors met with Thurmond to discuss the harassment and quickly determined that, "this situation was far too serious to be handled at [their] level." *Id.* The supervisors advised the human resources manager that the circumstances "need[ed] immediate attention and some in-depth investigation." *Id.*

Pursuant to its policy and practice of immediately investigating sexual harassment complaints, General Mills commenced a thorough review of the situation. Def. 12(M) and Pl. 12(N) ¶ 20; D134. The company advised Williams and his union representatives that he was suspended pending an investigation of a sexual harassment complaint. Def. 12(M) and Pl. 12(N) ¶ 20. The company informed Williams that he would be given the opportunity to explain his side of the story, and if the company concluded the allegations were unfounded, he would be paid for his time off. *Id.* Williams responded that he just liked to talk to everyone, but denied harassing anyone. *Id.*

General Mills contends that company officials spoke to eight employees during the investigation, revealing that Williams engaged in a pattern of conduct involving verbal harassment of the complaining parties as well as other female employees. Def. 12(M) ¶ 21; D115. Williams denies the implication that each of the eight employees established or confirmed an alleged "pattern of conduct." Pl. 12(N) ¶ 21.

Thurmond told the investigators she was frightened of Williams. Def. 12(M) and Pl. 12(N) ¶ 21. She said she did not know what Williams was capable of doing and she was concerned driving home alone because of his threats to follow her. *Id.* Thurmond asserted Williams made the following comments to her: (i) "I'd like to caress your body;" (ii) "Why don't you take your sweatshirt off? I guess you don't have breasts to show;" (iii) "I see you got them tight jeans on again. Do

---

**2.** Williams concedes the facts surrounding the 1990 sexual harassment investigation were re-

ported to the company and are reflected in company documents, unless otherwise noted.

you wear those to show off your butt?"; (iv) "I love women with big breasts. I love to lay my head on them;" (v) "You need a nice man like me to caress your body;" (vi) "Let me come over. I'll pay your rent;" (vii) "I need a woman;" (viii) "Why don't you take your jeans off;" and (ix) in response to her refusing his request for a date, "I don't want to take no for an answer." *Id.;* D116–19.

Cheryl Ann Reynolds complained that Williams frequently asked her out and that this made her very uncomfortable. Def. 12(M) and Pl. 12(N) ¶ 22; D123. She explained that Williams said, "Want to go to the Bears game? I'll be your blanket." *Id.* Tammy Bolton reported that Williams followed women around, including an employee who had since quit. Def. 12(M) and Pl. 12(N) ¶ 22; D115, D121. Beverly Talley stated that Williams appeared to be waiting for Thurmond the day he threatened to follow Thurmond home. Def. 12(M) and Pl. 12(N) ¶ 22; D122. Tally reported that Williams said things to Thurmond that "weren't called for" in the cafeteria. *Id.* Lynette Erserg stated she could not understand why Williams would not leave Thurmond alone. Def. 12(M) and Pl. 12(N) ¶ 22; D125.

After interviewing the witnesses, General Mills held a meeting with Williams and union representatives. Def. 12(M) and Pl. 12(N) ¶ 23. Williams was informed what Thurmond and others reported, and was provided the opportunity to explain his side of the story. *Id.* Williams contended that he did nothing wrong and was simply "paying compliments to an attractive woman." *Id.*[3] He maintained that he just liked to "talk to everybody." *Id.*

General Mills told Williams that his conduct and prior record warranted termination. Def. 12(M) and Pl. 12(N) ¶ 24; D109. At the union's urging, General Mills agreed to give Williams one final chance, reducing his discipline to a one-week suspension. *Id.*

Williams, the union and the company agreed that Williams would be placed on indefinite probation and that any further incident of harassment would result in his immediate termination. *Id.;* D109–10.

## III. *1994 SEXUAL HARRASSMENT*[4]

In October 1993, General Mills held intensive, around-the-clock training on harassment in the workplace, which all West Chicago employees including Williams were required to attend. Def. 12(M) and Pl. 12(N) ¶ 25; D148–51. During the sessions, company management defined and described prohibited harassment, offered examples of inappropriate behavior and emphasized that it would not tolerate harassment. *Id.* General Mills distributed materials that defined harassment and answered commonly-asked questions. *Id.*

Williams attended a training session and received the materials. Def. 12(M) and Pl. 12(N) ¶ 26. However, Williams did not read the materials because, "he didn't think it was really important to read what the company had to say about sexual harassment," and had no leisure time during November 1993. *Id.*

In September 1994, an employee reported to company management that Williams had been sexually harassing female employee Karen Corder for months and that his conduct included verbal harassment and inappropriate touching. Def. 12(M) and Pl. 12(N) ¶ 27; D158, D195. The human resources managers immediately met with Corder, who asserted that Williams sexually harassed her over a period of many months. *Id.* She described an incident where Williams opened a door for her and ran his hand across her chest. She reported that on another occasion, Williams ran his hand up and down her back in the plant cafeteria. She claimed that Williams held on to her hand at the time

---

3. The company contends Williams "did not deny making the statements." Def. 12(M) ¶ 23; Williams Dep. at 117–24; D108–09; D135–38. Williams states he is unable to admit or deny "making the statements" because he cannot determine to which statements the company refers. Pl. 12(N) ¶ 23. The cited documents show that Williams denied making many statements attributed to him by Thurmond, but admitted to pay-

ing Thurmond compliments about her outfits, including her jeans. Williams Dep. at 117–24.

4. Williams concedes the facts surrounding the 1994 sexual harassment investigation were reported to the company and are reflected in company documents, unless otherwise noted.

clock. *Id.* She stated that Williams repeatedly asked her on dates, even though she refused on each occasion and informed Williams she was married. *Id.* ·Corder reported that Williams made the following comments: (i) "Why don't you just go out with me?"; (ii) "I can guess what you drink;" (iii) "We don't have to end up in bed;" and (iv) "Aren't you going to change your mind?" *Id.* Corder stated that Williams' remarks were sexual in nature and she felt threatened. *Id.* She repeatedly rebuffed Williams' advances, telling him: (i) "I'm not interested;" (ii) "Leave me alone;" (iii) "My husband wouldn't approve;" (iv) and "Don't touch me." *Id.* Corder said she was intimidated by the fact that Williams did not seem to get the message that his conduct was unwelcome, no matter how many times she told him. *Id.* When the human resources managers asked why Corder did not complain about Williams' behavior earlier, Corder explained that she did not want other employees on the plant floor to treat her differently and that she was trying to resolve the situation on her own. Corder identified several witnesses to the harassment. *Id.*[5]

After the investigators spoke with Corder, they met with Williams and his union representative to advise him of the allegations and to hear his response. Def. 12(M) and Pl. 12(N) ¶ 28. Williams admitted touching Corder on the back in the cafeteria and he *acknowledged the touching caused her to jump, scream, and say, "leave me the hell alone." Id.*[6] Williams further admitted he grabbed her hand at the time clock, but "didn't think anything of it." Def. 12(M) and Pl. 12(N) ¶ 28; Williams Dep. at 192; D193.[7] Williams acknowledged that he asked Corder to have a beer with him several times, but

she declined and said that she was married. Def. 12(M) and Pl. 12(N) ¶ 28. When asked at the meeting about brushing against Corder's chest, Williams said he did not remember. Williams Dep. at 204–06; D192.[8] Williams contended that he was not violent toward Corder and that if he upset her, an *apology should suffice. Def. 12(M) and Pl. 12(N) ¶ 28.* The investigators told Williams that they would be talking to additional witnesses and would report to him later. *Id.*

Over the next few days, the company investigators talked to all other identified witnesses. Def. 12(M) and Pl. 12(N) ¶ 29; D189. Mary Bueschen observed that Corder was upset one day and Bueschen "got it out of her" that Williams was really bothering Corder by touching and talking to her. *Id.* Bueschen was in the cafeteria when Williams purportedly caressed Corder's back and heard Corder tell Williams to leave her alone. *Id.* Bueschen told Williams that "touching is not friendly," and to leave Corder alone. Bueschen reported to the investigators that Williams "rubbed up against [Corder], touched [Corder's] chest, and pretended it was an accident, but it wasn't." *Id.*

Yolanda Smith told the investigators that Corder regularly complained to her about Williams' behavior. Smith reported:

> He would not leave her alone. He always seemed to find her wherever she was. She could not take it any more and didn't know how she could deal with it.... Her main concern was to deal with it on her own, so it wouldn't effect his job, but she thought she may have to do something because he just doesn't understand. I know she was

---

**5.** Williams denies he intended to harass Corder. Pl. 12(N) ¶ 27; Affidavit of Alvin Williams ("Williams Aff.").

**6.** Williams denies that he meant to touch Corder in a sexual way. He stopped and immediately apologized when she screamed. Pl. 12(N) ¶ 28; Williams Aff. ¶ 4.

**7.** In his 12(N) statement, Williams denies "grabbing" Corder's hand, citing paragraphs 2–5 of his affidavit. Pl. 12(N) ¶ 28. However, Williams' affidavit does not reference the allegation that he grabbed Corder's hand. At his depo-

sition, Williams testified that he possibly grabbed her hand "out of unawareness." Williams Dep. at 192. The memorandum summarizing the company's meeting with Williams indicates he stated he "grabbed her hand and said hello." D192. Williams admitted the memorandum accurately summarized the meeting. Williams Dep. at 206. Thus, Williams admits grabbing Corder's hand.

**8.** In his May 2, 1996 affidavit, Williams attests that he did not run his hand across Corder's chest. Williams Aff. ¶ 2.

at the end of her rope. No one should have to work under those conditions. Def. 12(M) and Pl. 12(N) ¶ 30; D188.

Dennis Martch told the investigators that Corder complained to him about Williams' conduct, including how Williams brushed against her breasts. Def. 12(M) and Pl. 12(N) ¶ 31; D190. Martch stated that although he had not witnessed Williams' inappropriate behavior, he believed Corder was telling the truth. *Id.*

On October 10, 1994, General Mills met with Williams and advised him of the charges against him and asked for his side of the story once again. Def. 12(M) and Pl. 12(N) ¶ 32. Williams stated he was just being friendly and denied he was trying to get sex from anyone. *Id.* Williams explained, "This is not about sex. I have a woman at home. I can get sex on the street." *Id.* Williams denied that his behavior could create a hostile environment for Corder since he was her peer, not her supervisor. *Id.* Williams contended that his conduct towards Corder did not constitute sexual harassment and that he did nothing wrong. *Id.*

Based on the investigation, General Mills determined that Corder was truthful and was sexually harassed by Williams. Def. 12(M) ¶ 33; Williams Dep. 206; D196–98. The company concluded that Williams lacked any excuse for not understanding sexual harassment particularly given his prior history of charges, counselling, training, and discipline. *Id.* Given these circumstances, the company terminated Williams effective October 10, 1994. Williams summarily denies the conclusions drawn by the company, but does not contest that these determinations were articulated in the company documents. Pl. 12(N) ¶ 33. Thus, the company's conclusions are deemed admitted for purposes of expressing the company's articulated reason for terminating Williams.

General Mills contends its decision to terminate Williams was made without regard to his race and was based on the belief that his conduct was unacceptable behavior at General Mills. Def. 12(M) ¶ 34; Affidavit of Katherine McManus ("McManus Aff.") ¶¶ 5–6. Williams denies Def. 12(M) ¶ 34, citing paragraph six of his affidavit. Pl. 12(N) ¶ 34. In his affidavit, Williams attests that his claim "throughout my disciplinary process and this litigation is that I was treated and punished differently because of my race, African American. The evidence provided by General Mills, Inc.'s own employee disciplinary files supports my claim." Williams Aff. ¶ 6.

General Mills contends that Williams stated the reason it terminated him was based on his prior history of sexual harassment, which Williams claims the company should have ignored. Def. 12(M) ¶ 35; Williams Dep. at 172–74. Williams does not contest Def. 12(M) ¶ 35. Pl. 12(N) ¶ 35. General Mills further contends that Williams denies that race precipitated his termination. Def. 12(M) ¶ 35; Williams Dep. at 172–74. Williams denies this statement, claiming it is misleading. Pl. 12(N) ¶ 35. Williams maintains the cited portion of his deposition shows that defense counsel was referring to the fact that allegations were made by African American women against him in urging Williams to deny the racial aspect of the credibility contest between Williams and his accusers. *Id.*

## IV. *ALLEGEDLY COMPARABLE EMPLOYEES*

In 1989, Peter Tselios, a caucasian male employee, was accused of touching an air hose to a female employee's buttocks. Def. 12(M) and Pl. 12(N) ¶ 36; D287. In 1992, another female employee complained that Tselios became angry with her and used abusive language towards her. *Id.* General Mills investigated and Tselios was suspended for one week, referred to an employee assistance program counselor, and was warned that any further incidents of harassment of any kind would result in his immediate termination. *Id.* The parties differ over whether Tselios' abusive language in 1992 was considered sexual; General Mills claims Tselios did not use sexually abusive language, while Williams claims the 1992 incident was sexual harassment. Def. 12(M) ¶ 36; Pl. 12(N) ¶ 36.

In 1991, Ron Kellogg, a caucasian male employee, was accused of grabbing a female employee's breast while she was on the telephone. Def. 12(M) and Pl. 12(N) ¶ 37;

D238–39. After a full investigation, Kellogg was suspended for two weeks, referred to employee assistance, and placed on permanent probation whereby any further incidents of sexual harassment would result in his immediate termination. *Id.*

In 1992, a female employee complained that Kellogg made her feel uncomfortable after he talked with her on a few occasions. Def. 12(M) and Pl. 12(N) ¶ 38; D276. General Mills management instructed Kellogg to refrain from talking to the employee in the future. Def. 12(M) and Pl. 12(N) ¶ 38; D277. General Mills contends the female employee did not complain of sexual harassment or any other improper behavior. Def. 12(M) ¶ 38; D276. Williams denies that Kellogg's conduct was not of a sexually harassing nature. Pl. 12(N) ¶ 38.

In 1992, a female employee asked Fred Hornbuckle, a caucasian male employee, for help removing a mixer screen. He allegedly told her to get some other employees to help her and to "tell them that if they don't help you, you'll f--k them." Def. 12(M) and Pl. 12(N) ¶ 39; D304. The female employee also was offended that Hornbuckle wore tight pants and had a habit of adjusting himself. *Id.* After a full investigation, General Mills issued a formal written reprimand against Hornbuckle and told him to cease this conduct. Def. 12(M) and Pl. 12(N) ¶ 39; D304–05.

Over a four-year period, Johnny Stewart, an African American male employee, was accused of engaging in sexual harassment on four separate occasions. In 1991, he was accused of moving his hips in a sexual fashion and otherwise offending a female employee. Def. 12(M) and Pl. 12(N) ¶ 40; D249. No action was taken against Stewart. *Id.* In April 1993, Stewart was accused of making sexual comments to a female employee. Def. 12(M) and Pl. 12(N) ¶ 40; D290. No action was taken against Stewart. *Id.* In August 1993, another female employee complained that Stewart made inappropriate comments to her and tried to hold her hand. *Id.* In

1995, a female employee reported that Stewart used his tongue in a sexually suggestive manner toward a second female employee. Def. 12(M) and Pl. 12(N) ¶ 40; D302. During the investigation, the second female employee stated she worked the matter out on her own. No action was taken against Stewart. Def. 12(M) and Pl. 12(N) ¶ 40; D302–03.[9]

In 1991, Frances Adams, an African American female employee, reported sexually suggestive comments made by two caucasian male supervisors, Pete Fisher and Tony Apreala. Def. Reply and Pl. 12(N) Add. Facts ¶ 41; D268; Williams Aff. ¶ 7. Williams contends General Mills failed to take any action against the men. Pl. 12(N) Add. Facts ¶ 41. General Mills contends that Williams fails to cite any support for the assertion that it failed to take action, and that D268 and Williams' affidavit do not support his contention. Def. Reply to Pl. 12(N) Add. Facts ¶ 41. Local Rule 12(N)(3)(b) requires a plaintiff's statements of additional material facts to be accompanied by citation to record evidence. The previously cited documents do not support Williams' statement that no action was taken against the men. The company document details an investigation into the incident and a warning issued to the men not to retaliate against the complainant. Therefore, Williams' statement that, "[n]o action was taken against these men," is stricken.

Williams contends that in 1987, Richard Shoemake, a caucasian male employee, was accused of making sexual gestures and comments to between four and seven female employees. Williams maintains the allegations were substantiated, but that no disciplinary action was taken. Pl. 12(N) Add. Facts ¶ 42; D231. General Mills admits that in 1987, Shoemake was accused of making sexual gestures and comments to one female employee and that four of the six witnesses interviewed stated that they observed or experienced the same conduct from Shoemake. Def. Reply to Pl. 12(N) Add. Facts ¶ 42;

9. Williams contends he could not determine the date or substance of handwritten documents D249, 290. Pl. 12(N) ¶ 40. However, because Williams does not deny or controvert the allegations contained in D249, 290, they are deemed admitted. Williams admits the other assertions in Def. 12(M) ¶ 40. *Id.*

D231. The company denies that it failed to take disciplinary action against Shoemake because the cited document is a write-up of the incident that the company claims was placed in Shoemake's personnel file. *Id.*[10]

Williams contends that in 1989 and 1990, David Radke, a caucasian male employee, rubbed women employees' buttocks. Williams maintains no action was taken in 1989. Williams asserts that in 1990, Radke's personnel file was documented but no other disciplinary action was taken. Pl. 12(N) Add. Facts ¶ 43; D232–33. General Mills admits that in 1990, a female employee accused Radke of rubbing her buttocks on one occasion and claimed that he had previously done the same in 1989. Def. Reply to Pl. 12(N) Add. Facts ¶ 43; D232. The company further admits that a write-up was placed in Radke's file and that he was advised, "any future proven incidents of this nature would result in further discipline up to and including termination," and that "if he in any way threatened or retaliated against any employee in the Company, whether or not he agreed with the allegations against him, that he would also be subject to immediate termination." *Id.* The company denies that Radke was accused of touching more than one female employee in that the claim is not supported by the cited documents. *Id.* General Mills further denies Williams' statement that no action was taken against Radke in 1989 because no complaint was made in 1989; it was only relayed to the company as part of the 1990 investigation. *Id.*

In 1993, a women employee accused Gilberto Gonzalez, an Hispanic employee, of sexually harassing her by pulling up his pant leg and pointing to it. No disciplinary action was taken. Def. Reply and Pl. 12(N) Add. Facts ¶ 44; D300.

In 1992, General Mills investigated a complaint that Andy Williams, an African American male employee, made inappropriate and offensive comments to a female outside contractor about women's roles, marriage and careers. The complaint characterized Andy Williams' "I know something that you don't know" attitude. The complainant contended that Andy Williams prevented her from completing her assignment. Def. Reply and Pl. 12(N) Add. Facts ¶ 45; D278–82.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARDS

█ General Mills moves for summary judgment under Fed.R.Civ.P. 56. A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1209 (7th Cir.1993). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir.1990). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services–Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir.1992).

█ A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993); *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–71 (7th Cir.1992). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). "The

10. McManus attests that "summaries of the proceedings of disciplinary meetings and the like were drafted and placed in the appropriate employee's personnel file." McManus Aff. ¶ 4.

mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

## II. *DISCRIMINATION ANALYSIS*

Section 1981 discrimination claims are analyzed in the same manner as Title VII claims. *Bratton v. Roadway Package Sys., Inc.,* 77 F.3d 168, 176 (7th Cir.1996); *Pilditch v. Board of Educ. of City of Chicago,* 3 F.3d 1113, 1116 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994). Williams may prove his race discrimination claim against General Mills in one of two ways. First, Williams may present direct evidence that he was discharged for discriminatory reasons. *See, e.g., Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Perfetti v. First Nat'l Bank of Chicago,* 950 F.2d 449, 450 (7th Cir.1991), *cert. denied,* 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992). Alternatively, Williams may rely on indirect evidence of discrimination, employing the burden-shifting framework recognized by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Bratton,* 77 F.3d at 176; *Timms v. Frank,* 953 F.2d 281, 286 (7th Cir.), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2307, 119 L.Ed.2d 228 (1992).

▇▇▇ Under the *McDonnell Douglas* framework, the plaintiff has the burden of establishing a *prima facie* case of discrimination; once a *prima facie* case is established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Timms,* 953 F.2d at 286. If the employer articulates a non-discriminatory reason for its action, the plaintiff must then prove that the employer's stated reason is merely a pretext for discriminatory action, either "directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is

not credible." *DeLuca v. Winer Industries, Inc.,* 53 F.3d 793, 797 (7th Cir.1995) (quoting *Sarsha,* 3 F.3d at 1039). The ultimate burden of persuasion remains at all times with the plaintiff. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Williams relies on indirect evidence of discrimination. To establish a *prima facie* case of race discrimination, Williams must show: (1) that he is a member of a protected class; (2) he was performing according to General Mill's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated caucasian employees were treated more favorably. *Bratton,* 77 F.3d at 176; *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1132 (7th Cir.1994); *Timms,* 953 F.2d at 286. General Mills concedes the first and third prongs. However, the company contends Williams failed to perform according to its legitimate expectations in that it honestly believed he sexually harassed a number of female employees over a ten-year period. General Mills presents this argument in the context of articulating its legitimate, non-discriminatory reason for terminating Williams.

The company further maintains Williams cannot show that similarly situated caucasian employees were treated more favorably. *Perkins v. Brigham & Women's Hosp.,* 78 F.3d 747 (1st Cir.1996); *EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145 (7th Cir.1996); *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994); *Sarsha,* 3 F.3d at 1042; *Timms,* 953 F.2d at 286; *Jaffe v. Federal Reserve Bank,* 586 F.Supp. 106 (N.D.Ill.1984). General Mills asserts that Williams has not shown that the allegedly comparable employees "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Perkins,* 78 F.3d at 751. The company contends the caucasian male employees Williams identifies did not commit infractions remotely comparable to Williams' alleged intimidation, assault, obscenities, and general sexual harassment that occurred over a ten-year period. The company maintains that the caucasian male em-

ployees received varying levels of punishment, including periods of suspension. The company further insists that Williams' reference to its lenient treatment of two African American male employees accused of sexual harassment only bolsters the legitimacy of Williams' termination.

Rather than attempt to satisfy his *prima facie* case and rebut the articulated, non-discriminatory reason for termination, Williams devotes his response to attacking what he views as a discriminatory investigative process at General Mills. Williams contends General Mills has engaged in a pattern and practice of racial discrimination in the manner in which it investigates sexual harassment complaints. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). The crux of Williams' contention is that General Mills conducts detailed investigations into allegations against African American males, while performing less exacting investigations into allegations against caucasian males. Thus, through the allegedly different level of detail sought in the investigations, Williams asserts General Mills treats similarly situated caucasian males more favorably than African American male employees. *Troupe v. Lord & Taylor*, 20 F.3d 734, 736 (7th Cir.1994). Because of the inequitable disciplinary process, Williams argues that a rational trier of fact could reasonably infer his termination was a result of his race.

Williams fails to meet his *prima facie* burden. First, Williams offers no evidence that he was performing his job according to General Mills' legitimate expectations. This burden should not be too difficult. General Mills does not contend that Williams failed to adequately perform his job duties. Rather, the company asserts Williams' sexual harassment misconduct was the reason for his discharge. While the company attempts to merge the analysis between Williams' minimal burden of production at the *prima facie* stage with the company's articulation of its legitimate business reason for discharge, the two should be analyzed separately if the company intends to challenge the *prima facie* case. Simply because the company honestly believes that Williams sexually harassed female employees does not mean that Williams did not receive adequate performance evaluations concerning his job duties. In *Sarsha*, a manager was fired for violating a company's no-dating policy and failing to heed warnings not to date his subordinate, exposing the company to potential liability in the form of a sexual harassment suit. *Sarsha*, 3 F.3d at 1039. Nevertheless, the court found and the parties agreed that the plaintiff established a *prima facie* discrimination case, having shown that he performed well at his job, despite his alleged willful misconduct. *Id.* The same analysis should apply here.

■ Despite the minimal *prima facie* burden, Williams fails to offer any evidence that he performed his job satisfactorily. Williams does not offer any of his performance evaluations. While General Mills does not assert that Williams was a poor performer, Williams' failure to present supporting evidence defeats his case.

■ Williams also fails to show that similarly situated employees outside his protected class were treated more favorably than he. Williams contends that General Mills' disciplinary process and procedures as applied to sexual harassment complaints discriminated against African Americans. Of the 14 sexual harassment investigations, three concerned Williams, two involved other African American males, eight concerned caucasian male employees and one pertained to an Hispanic male. Williams maintains that the depth of investigation, thoroughness of documentation, credence given to the complainant and ultimate penalty imposed differed depending on the race of the accused.

■ Williams' argument fails because none of the other employees accused of sexual harassment is objectively similarly situated to him. Williams allegedly engaged in a ten-year period of harassment, was investigated three times and given two suspensions before termination. None of the caucasian employees was accused of engaging in similar conduct over a lengthy time period. As explained in *Perkins*, the allegedly comparable employees must have engaged in materially similar conduct without mitigating cir-

cumstances that explain the difference in their treatment. *Perkins,* 78 F.3d at 751. *Perkins* sets forth a test: whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Id.* (inner quotation and citation omitted). There, the court noted the plaintiff's unique and reprehensible history of repeated disciplinary actions over a ten-year period. *Id.* This sufficiently distinguished the defendant from allegedly comparable employees. In *Timms,* the mitigating circumstances preventing the plaintiff from establishing a *prima facie* case of race and age discrimination were: (i) the plaintiff was seeking reinstatement for a second time while the allegedly similarly situated employee only sought reinstatement once; (ii) the plaintiff never voluntarily resigned before while the comparison employee voluntarily resigned once; and (iii) two different decision-makers were involved. *Timms,* 953 F.2d at 286–87.

Williams does not identify another employee whom he claims engaged in the same level of conduct to a similar number of women over an extended time period. This is Williams' primary burden in attempting to establish more favorable treatment of similarly situated employees, and his failure to do so spells his failure to meet his *prima facie* burden. Nor does Williams contend that the employees he identifies should have been terminated. Rather, Williams engages in relativistic comparisons with other individuals' isolated and less extensive conduct and treatment. This attempt to mete out fairness issues by comparing conduct that does not approach Williams' history is insufficient and unconvincing.

Williams claims that Shoemake, a caucasian, is similarly situated and that General Mills treated Shoemake more favorably concerning Shoemake's 1987 investigation and discipline. Shoemake was accused of making sexual gestures and comments to a female employee. D231. Williams' claim that the charge against Shoemake was not investigated to the same extent as the allegations made against him is unwarranted. In the course of the company's investigation into Shoemake's alleged harassment, the company interviewed six other women, which company representative Dave Hendrix documented. *Id.* Of the six women interviewed, four stated they either observed or experienced the same conduct from Shoemake. *Id.* Shoemake offered an explanation similar to Williams, that he was "only kidding." *Id.* The company documented the incident and placed it in Shoemake's personnel file. *Id.*

In comparison, Williams contends he was suspended for six months in total for his alleged conduct. *See* Pl. Response at 7. First, Williams was not suspended for six months. He received a two-month suspension in 1986. D79–80. Williams was suspended for only a week in 1990. D109–10. Second, Williams' alleged conduct was significantly more severe than Shoemake's actions. Williams was accused of intimidating and physically touching women, including in the women's restroom. A woman stated she did not feel safe around Williams. Even after receiving his initial suspension, Williams continued to engage in harassing conduct, including physical touching and threatening to follow women to their homes. Shoemake was never subject to a second complaint. Thus, Williams is not similarly situated to Shoemake.

Williams points to two other caucasian employees, Tselios and Radke. Both allegedly touched women's buttocks. D232–33; D287. Williams contends Radke received no discipline, while Tselios was suspended for a week only after he subsequently called a female employee derogatory names.[11] Williams does not contend that Tselios should have been terminated. Williams Dep. at 134. These isolated incidents are not helpful. Both men were investigated when complaints were brought to the company's attention. Both received warnings not to engage in

11. General Mills contends Williams stated in his deposition that Tselios was suspended for one week after allegedly touching a woman's buttocks with an air hose. Def. Reply at 5; Williams Dep. at 133–34. However, the company's documents only show that Williams was suspended for one week after verbally harassing a female employee. *See* D287. Drawing inferences in Williams' favor, the court infers that Tselios was not suspended after the air hose incident, and was suspended for only one week.

similar conduct in the future or face further discipline up to and including termination. D232, 287. After having a written disciplinary warning placed in his personnel file, the company received no more complaints about Radke's behavior. Tselios' discipline was similar to Williams' initial discipline: he was suspended and received mandatory counseling. D287. Subsequently, the company did not receive another complaint about Tselios. Thus, unlike Williams, neither Radke nor Tselios continued to engage in harassing conduct that was brought to the company's attention.

Ron Kellogg, a caucasian employee, was accused of grabbing a female employee's breast. The company investigated the incident, suspended Kellogg for two weeks, referred him to employee assistance, and placed him on permanent probation whereby any further incidents of sexual harassment would result in his immediate termination. D238–39. Three months later, a female employee complained that Kellogg made her feel uncomfortable after he tried talking to her a few times. D276. The employee did not complain that Kellogg made sexual comments or touched her in any way. The few times Kellogg tried talking to the employee, the conversations ended quickly because she would ignore him or other employees would join in the conversation. The employee did not complain that Kellogg continued talking to her after she told him to stop. D276–77. General Mills instructed Kellogg to stop talking to the employee in the future, but apparently concluded that the incident did not merit discipline. D277. Once again, this isolated incident pales in comparison with the allegations brought against Williams on three separate occasions, and explains the company's different treatment of the two employees.

Accordingly, Williams fails to identify similarly situated non-protected employees who were treated more favorably. Thus, Williams cannot establish a *prima facie* case of discrimination.

Even if Williams could make out a *prima facie* case, he fails to prove that General Mills did not honestly believe that he engaged in several forms of sexual harassment as alleged by the many women over the ten-year period. Williams does not attempt to show that General Mills' articulated reason was not the true reason. Rather, he relies on circumstantial proof of an alleged pattern and practice of unlawful discrimination against African Americans through the company's investigation and documentation of sexual harassment complaints.

Williams' reliance on the more deferential burden-shifting model adopted in *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), rather than the *McDonnell Douglas* burden-shifting model is misplaced.[12] Williams cites *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir.1986), as support for his novel application of pattern and practice theory of discrimination to an individual discrimination case. However, neither *Cox* nor *Teamsters* is applicable. In *Cox*, the appellate court held the district court erred in decertifying a class of 18 plaintiffs and following the *McDonnell Douglas* model in trying the individual claims. The appellate court remanded with directions for recertification and trial as a class action. *Id.* at 1558. The appellate court further ruled that once the district court found the employer maintained a discriminatory policy of reserving certain positions for men, the district court should have applied the *Teamsters* burden-shifting model. *Id.* at 1559. "Thus, *Cox* does not stand for the proposition that individual plaintiffs in a non-class action are entitled to enjoy the benefit of *Teamsters'* burden-shifting model." *In re Western Dist. Xerox Litigation*, 850 F.Supp. 1079, 1083 n. 4 (W.D.N.Y.1994) (citing *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866–67 n. 6 (7th Cir.1985) ("Plaintiffs' use of 'pattern-or-practice' language also seems to be misplaced, since such 'suits, by their very nature, involve claims of classwide discrimi-

---

12. In a pattern and practice case, if the plaintiff can establish "that racial discrimination was the company's standard operating procedure," *see Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855, the burden shifts to the employer to prove that the plaintiff was not the victim of discrimination. *See Cox*, 784 F.2d at 1559.

nation,' ... and the five plaintiffs, while attacking policies that would have affected all of Jewel's women employees as a class, have stated only their individual claims, not a class action")).

Williams' attempt to prove intentional discrimination through use of circumstantial evidence is not persuasive. In *Troupe*, the Seventh Circuit held that a plaintiff could prove discrimination by using circumstantial evidence that employees "similarly situated to the plaintiff other than [by race] ... received systematically better treatment." *Troupe*, 20 F.3d at 736. Even if this court were to give Williams the benefit of the doubt and use the evidence of similarly situated employees to find a *prima facie* case of discrimination, the evidence is not sufficient to prove intentional discrimination because it did not show "systematically more favorable treatment" toward similarly situated caucasian employees. *E.E.O.C. v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145 (7th Cir.1996).

In addition to evidence concerning purportedly similarly situated caucasian employees, Williams relies on the company's investigation and documentation of incidents concerning other minorities to prove intentional discrimination. The three individuals Williams identified, however, were never suspended or terminated. Johnny Stewart, an African American, was accused of engaging in sexual harassment on four separate occasions over a four-year period. The company agreed to drop its investigation and Stewart was never disciplined. Gilberto Gonzalez, an Hispanic employee, was accused of sexually harassing a female employee by pulling up his pant leg and pointing to it. The company did not discipline Gonzalez. Andy Williams, an African American male employee, made inappropriate and offensive comments to a female outside contractor about women's roles in the workplace. The complainant contended that Andy Williams prevented her from completing her assignment. Andy Williams was warned that his comments offended the outside contractor and that he should refrain from making similar comments in the future.

The company's actions concerning Stewart, Gonzalez and Williams do not show the company systematically treated caucasians more favorably. The company documentation shows that the General Mills takes its obligations concerning sexual harassment seriously and investigates allegations when they are brought to the company's attention. The company documented and investigated eight accusations made against caucasian employees. Indeed, the majority of the company's sexual harassment investigations were of caucasian male employees, showing that caucasians are not treated more favorably concerning company investigations of harassment allegations. As with some of the allegations against African American employees, General Mills issued formal written reprimands against some of the caucasians who purportedly made offensive comments on isolated occasions.[13]

In sum, Williams failed to establish a *prima facie* case of discrimination. Nor did Williams prove that General Mills' articulated basis for terminating him, sexual harassment, was not the real reason or that he was more likely terminated because of his race. Rather, the evidence shows that General Mills took its obligation to investigate and remediate sexual harassment complaints seriously, and that it terminated Williams because it honestly believed that he repeatedly sexually harassed women over a ten-year period despite previous warnings, discipline, counseling and training.

### CONCLUSION

The summary judgment motion is granted. Judgment is entered in favor of defendant

---

13. As for the only incident where Williams claims an African American complainant was not believed, the company investigation included interviewing a female witness who supported one of the supervisors. *See* D271. Both supervisors were warned that the company takes harassment allegations seriously and not to retaliate against the complainant. D269–70. No reasonable inference can be drawn from this incident that shows the company's articulated reason for terminating Williams was pretextual.

General Mills, Inc. and against plaintiff Alvin Williams.