**Raymond L. HUGLEY, Plaintiff,**

v.

**The ART INSTITUTE OF CHICAGO, Richard Hall and Marion Ellis, Defendants.**

No. 96 C 7452.

United States District Court,
N.D. Illinois,
Eastern Division.

April 24, 1998.

Ronald Barry Schwartz, Hedberg, Tobin, Flaherty & Whalen, P.C., Chicago, IL, for, plaintiffs.

Bruce R. Alper, Thomas Michael Wilde, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for, defendants.

*MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

Plaintiff Raymond Hugley sues his former employer, the Art Institute of Chicago ("AIC"), alleging that his termination was racially motivated and prompted by false and defamatory statements. Count I of Hugley's complaint claims that his termination violated both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Count II contends that AIC and two of its employees, Richard Hall and Marion Ellis, defamed Hugley by falsely accusing

him of threatening a fellow employee's life. Defendants have moved for summary judgment on both counts. For the reasons that follow, we grant summary judgment on Count I; Count II is dismissed without prejudice to its presentment in state court.

### RELEVANT FACTS [1]

#### A. Background

Raymond Hugley worked for the Art Institute of Chicago for about eight years. He was hired in February 1987 as a locksmith in the Department of Protection Services ("DOPS"). Under the supervision of DOPS Director Bob Koverman, Hugley was promoted to lead locksmith, a position Hugley held until his termination on November 21, 1995. Hugley's wife, Desiree Hugley, also worked at the Art Institute, but in another department as a housekeeping supervisor. Hugley's suit arises from a series of unfortunate events that occurred at the AIC on November 15, 1995. That day, Mrs. Hugley issued a reprimand to a housekeeping employee under her authority, Richard Hall. According to Mrs. Hugley, she wrote-up Hall for disorderly conduct, insubordination and failing to police the bathrooms. Def.'s Facts ¶ 13; Pl.'s Dep. 110–112. Mrs. Hugley intended to write-up Hall for being intoxicated at work that morning as well, but never did so because the decision was not supported by her manager, Housekeeping Supervisor Ron Pushka. Def.'s Facts ¶ 16.

#### B. The Confrontations

Later that day, Hall had two separate confrontations with Mr. Hugley. Def.'s Facts ¶¶ 9,20. The first occurred around noon. According to Hugley, Hall approached both him and Mrs. Hugley as they met for lunch in a corridor near their offices. Pl.'s Facts ¶ 9. Hall and Hugley exchanged heated remarks. Hugley claims Hall was upset because Mrs. Hugley had called him a "junkie" while reprimanding him; Hall allegedly began cursing and yelling that Mrs. Hugley was not going to talk to him "that way."

1. The facts are derived from the parties' Local Rule 12(M)-(N) statements of fact and accompa- nying exhibits.

Def.'s Facts ¶ 9; Pl.'s Dep. 84–90. Hugley considered Hall's. remarks disrespectful to Mrs. Hugley, but not threatening. Pl.'s Facts ¶ 9; Pl.'s Dep. 91–92.

Shortly after this exchange, Hugley tried to call DOPS Director Bob Koverman and DOPS Supervisor Fred Venhuizen, in accordance with procedures that had been established as a result of previous encounters between Hugley and his wife's subordinates.[2] Def.'s Facts ¶ 8. Hugley was able to reach only Venhuizen, and the two met shortly afterwards to discuss the incident. Venhuizen told Hugley that he would take care of the situation. Pl.'s Facts ¶ 8. Venhuizen then met with Hall. Def.'s Facts ¶ 17. While Hugley was still eating lunch, Venhuizen called him and explained that there was nothing Venhuizen could do, and that Hugley should contact Assistant Personnel Director John Feery and Housekeeping Supervisor Ron Pushka instead. Hugley tried calling them both, and left messages requesting return phone calls. Def.'s Facts ¶¶ 14–17.

Hugley's second confrontation with Hall occurred around 2:45p.m., when Mrs. Hugley was preparing to leave work. Pl.'s Dep. 114–115. According to Hugley, he was working at his desk when he noticed Hall pacing back and forth outside his office. Pl.'s Facts ¶ 13. Hugley and Hall again exchanged words in the hallway. Def.'s Facts ¶ 21. Hugley testified that he told Hall to leave him and his wife alone. Pl.'s Dep. 120–121. He claims that Hall mumbled and cursed in response. Id. at 121.

Hall, however, claims that Hugley threatened his life during the confrontation. Hugley allegedly said that he would "bust a cap" in Hall—a phrase Hall translated as threat to shoot him. Hall Dep. 39–40. Hugley vehemently denies ever having threatened to "bust a cap" in Hall. Pl.'s Dep. 126.

The parties also disagree as to who witnessed this second confrontation. Hall claims that two other employees, Bruce McGee and Marion Ellis, were in the hallway at the time. Def.'s Facts ¶ 22. Ellis testified that she was escorting another worker near the area where Hugley and Hall were arguing.[3] Pl.'s Facts ¶ 18. Hugley denies having seen Ellis in the hallway until after the confrontation ended, see Pl.'s Facts ¶ 17, and claims that McGee did not enter the hallway until the encounter was well under way. Pl.'s Dep. 120. Hugley also questions the accuracy of Ellis' perception, pointing out that Ellis testified she could only hear, not see, the altercation. Pl.'s Facts ¶ 19.

Following the second confrontation, Hall went into the locker room and allegedly told McGee that Hugley had threatened to "bust a cap" in him. Def.'s Facts ¶ 23. Hall also claims· that on his way home from work, he told another AIC employee, Joyce Hathaway,[4] that Hugley had threatened him during the second confrontation. Id. ¶ 24. Finally, Hall says he mentioned the confrontations and Hugley's threat during a conversation he had with Ellis and Hathaway some time after the incidents.[5] Pl.'s Facts ¶ 56.

2. AIC management instituted this procedure on March 16, 1995, after Hugley complained to Assistant Personnel Director John Feery and Venhuizen that one of Mrs. Hugley's subordinates, Carl Wiggins, had provoked Mr. Hugley by insulting his wife. Feery Dep. 69–70; Def.'s Facts ¶ 8. Under the procedure, Mr. Hugley was to contact an AIC manager before taking any action against employees who became hostile toward him or Mrs. Hugley. Def.'s Exh. 7.

3. Hugley submits the affidavit of Rob Wisniewski, a construction worker who was on site at the AIC on November 15, 1995, stating that he signed out by 2:20 p.m. that afternoon and does not recall overhearing any arguments or raised voices while on the job. Pl.'s Ex. 10, ¶¶ 3, 9. Hugley asserts that Wisniewski was the worker whom Ellis was escorting; however, Wisniewski does not claim to have been accompanied by

Ellis at any point on November 15, 1995. Indeed, his affidavit acknowledges that he does "not have a specific recollection of the work I performed on November 15, 1995." Id. ¶ 8.

4. Hathaway was also Hall's girlfriend. Def.'s Facts ¶ 24.

5. The parties dispute exactly when this conversation took place. Although Ellis testified at her deposition that she talked to Hathaway and Hall about the incident the same day it happened, Hall testified that he did not discuss the incident with Ellis until much later. Pl.'s Facts ¶¶ 56–57. Hugley also seizes on Hall's testimony that he could not recall whether Ellis told him she overheard the alleged threat and that Hall was unaware Ellis was even a witness until an AIC attorney told him so. Pl.'s Facts ¶ 57. Hugley argues that this directly contradicts Ellis' testi-

## C. The AIC's Investigation

The next day, November 16, Hall told Pushka and Feery that Hugley had threatened him the day before. Def.'s Facts ¶¶ 26–27. Hall gave Feery the names of several employees who might have seen and heard the confrontation. Def.'s Facts ¶ 27. On November 29, 1995, Hall signed a memo recounting his version of the events. Def.'s Exh. B5. Hall's memo explained that Mrs. Hugley had insulted him during her reprimand, accusing him of being "wasted" when he was not, and that Mr. Hugley later accosted Hall in the corridor, calling him a "junkie," and threatening to "kick his ass" and "bust a cap" in him. Id.

That afternoon, Feery, Marion Alt (Director of Personnel), Venhuizen, Pushka and another AIC administrator met and decided to investigate these incidents. They also decided to place Hall and the Hugleys on paid leave pending investigation. Pushka and Venhuizen were assigned responsibility for talking to potential witnesses from their respective departments. Def.'s Facts ¶ 28.

DOPS Supervisor Venhuizen and DOPS Director Koverman interviewed Hugley, Ellis and other DOPS employees identified as potential witnesses. Def.'s Facts ¶ 29. McGee and Ellis submitted written statements. Ellis' statement corroborated Hugley's threat, which she claimed to have overheard during the second confrontation. Def.'s Facts ¶ 33. McGee's statement confirmed that Hugley's mood during the confrontation was aggressive and hostile, and that Hall had tried to disengage from the confrontation. Def.'s Facts ¶ 30. Koverman interviewed Hugley. After the interview, Koverman prepared a memo stating that Hugley had said he was too angry to remember if he had threatened to "bust a cap" in Hall. Def.'s Facts ¶ 35. Hugley later testified that he denied threatening Hall in the interview. Pl.'s Dep. 4–8.

On November 20, 1995, Feery and Alt met to discuss the results of the investigation. Based on the evidence, Feery was convinced that Hugley had threatened Hall's life. He thus recommended Hugley's termination pursuant to AIC Rules and Regulations, which prohibit "physically or verbally threatening another employee" on pain of discharge. Koverman agreed with Feery's recommendation; Hugley was terminated on November 21, 1995 for threatening Hall's life. Def.'s Facts ¶¶ 38–40.

## D. Hugley's Appeal

Using the AIC employee grievance procedure, Hugley appealed his termination. Def.'s Facts ¶ 41. Hugley and Venhuizen each selected one member of the grievance committee, and jointly selected a third, composing a committee of one African–American and two white employees. None of the grievance committee members had participated in the investigation of the incidents that led to Hugley's termination. Pl.'s Dep. 179.

The committee held a hearing a few months after Hugley's termination. Def.'s Facts ¶ 44. Among other evidence, the committee was presented with Hall's videotaped testimony and Ellis' written statement; neither testified in person. Def.'s Facts ¶ 44. The grievance committee unanimously agreed that the evidence showed that Hugley had threatened Hall's life, but disagreed on the appropriate level of discipline. Two members voted to uphold Hugley's discharge, and the third favored a warning. Def.'s Facts ¶ 45.

## E. Threats By Other AIC Employees

Besides Hugley, AIC is aware of only three other employees who have threatened AIC co-workers or superiors. Two, Jacqueline Hawkins and Shelton Cunningham, were African–American, and one, Mr. K.,[6] was

---

mony that she told Hall about witnessing the confrontations on November 15, 1995.

**6.** The parties agreed to protect Mr. K's identity with codes or other designations pursuant to an Agreed Protective Order entered June 10, 1997. AIC's memorandum in support of its motion for summary judgment blatantly violates this order

by revealing Mr. K's name—both first and last. This Court is appalled that counsel for AIC, a well-reputed law firm, would so cavalierly disregard a court order, then fail to acknowledge the violation after the plaintiff pointed it out in his response brief. Because this Court has no information that Mr. K. has yet been harmed by AIC's violation of the protective order, we will not

Pakistani. AIC terminated Hawkins on October 28, 1994, after he allegedly remarked that a fellow employee at the Goodman Theater needed a .357 between the eyes. Def.'s Facts ¶ 48. AIC terminated Cunningham on July 17, 1995, for placing on an employee's locker a note threatening his life. Def.'s Facts ¶ 27.

Mr. K's threat was made during a psychologist-supervised stress management seminar that AIC held in November 1992. Employees were encouraged to vocalize feelings of stress; Mr. K stated that his supervisor caused him stress and that he felt like killing all of his supervisors, including Koverman and Venhuizen. Def.'s Facts ¶ 50; Def.'s Exh. 19. AIC placed Mr. K on leave so that he could receive appropriate medical treatment. The company conditioned Mr. K's reinstatement on completing a treatment program and complying fully with AIC standards of conduct. Mr. K successfully completed his treatment and was reinstated to his position. Def.'s Facts ¶ 52.

## F. Hugley's Claims

After Hugley lost his appeal to the grievance committee, he filed a charge with the EEOC and received a notice of his right to sue. Hugley then filed suit in this Court. Hugley first claims that AIC terminated him not for any alleged threat against Hall, but rather because of his race, in violation of both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. As evidence, Hugley points to Koverman's investigation and the grievance committee proceedings. Hugley maintains Koverman spearheaded an investigation that, given Koverman's extensive investigatory experience, was so inadequate and biased that it reveals racial animus against Hugley. This investigation, in turn, produced tainted evidence that was ultimately submitted to the grievance committee members. Hugley bases his second claim, defamation, on Ellis and Hall's statements—made during the investigation—that Hugley threatened Hall's life. Defendants contend

that neither claim withstands summary judgment scrutiny.

## LEGAL STANDARDS

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the non-moving party, and draw all inferences in the non-movant's favor. *See Wolf v. Buss America, Inc.*, 77 F.3d 914, 918 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). But if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Unterreiner v. Volkswagen, Inc.*, 8 F.3d 1206, 1212 (7th Cir.1993).

In ascertaining whether a genuine issue of material fact exists, the court must "view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. 2505. If the "record taken as a whole could not lead the trier of fact to find for the non-moving party, there is no genuine issue of material fact for trial." *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, this Court's sole duty is to determine whether sufficient evidence exists to support a verdict in the non-movant's favor; credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of the judge deciding a motion for summary judgment. *See Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. These pronouncements apply with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Courtney v. Bio-*

impose sanctions at this time. Nevertheless, if this Court learns at some point that AIC's violation has damaged Mr. K. in some way, we will

seriously consider imposing appropriate sanctions.

*sound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994); *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993). Mindful of these standards, we examine Hugley's claims, beginning with Title VII and 42 U.S.C. § 1981.

## ANALYSIS

### A. Race Discrimination

Both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 prohibit employers from discriminating against their employees on the basis of race. *See Oates v. Discovery Zone,* 116 F.3d 1161, 1169 (7th Cir. 1997). Under both statutes, Hugley bears the ultimate burden of proving that his employment was adversely affected by his race; he may sustain that burden with either direct or circumstantial evidence of discriminatory intent. *Id.* at 1169–70; *see Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994). When, as in Hugley's case, there is no direct evidence of discrimination, the most common way to prove employment discrimination circumstantially is "by way of the burden-shifting approach first articulated in *McDonnell Douglas Corp. [v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ]." *O'Connor v. DePaul Univ.,* 123 F.3d 665, 669 (7th Cir.1997). To make out a prima facie case of race discrimination using the *McDonnell Douglas* method, Hugley must establish that (1) he is within a protected racial class; (2) he was meeting his employer's legitimate expectations; (3) he suffered some adverse employment action, and (4) he has evidence from which it can be inferred that the adverse action sprang from a "legally forbidden ground," for example, more favorable treatment of similarly situated non-black employees. *See Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158–59 (7th Cir.1996); *Ali v. Brown,* 998 F.Supp. 917, 925–26 (N.D.Ill.1998).

If Hugley succeeds in making a prima facie showing of discrimination, a rebuttable presumption of discrimination arises and the burden of production shifts to AIC to articulate a legitimate, non-discriminatory reason for terminating Hugley. *See Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To meet this burden, AIC must produce admissible evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). AIC is not required to persuade the Court that it was actually motivated by the proffered reason. *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089.

If AIC meets this burden, the presumption of discrimination dissolves and the burden of production shifts to Hugley to show that the proffered reason is a pretext for discrimination. *Id.* at 256, 101 S.Ct. 1089. Pretext can be established by showing (1) that discriminatory intent more likely than not motivated the employer; or (2) that "the employer's proffered explanation is unworthy of credence" because the defendant's explanation had no basis in fact, was not the real reason for the adverse action, or was insufficient to justify any adverse action. *See Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir.1995); *Lenoir v. Roll Coater,* 13 F.3d 1130, 1133 (7th Cir.1994).

AIC offers two alternate grounds in support of its motion for summary judgment on the discrimination claims. First, it argues that Hugley cannot satisfy the second and fourth prongs of his prima facie case. It contends that Hugley's violation of the written policy prohibiting threats against fellow employees precludes him from demonstrating satisfactory work performance at the time of his termination, and that Hugley cannot point to any similarly situated employee outside his protected class who was treated more favorably than he. Second, AIC argues that even if Hugley has established a prima facie case, he has not produced evidence from which a reasonable fact finder could infer that AIC's proffered reason for his termination was a pretext for discrimination. Because we agree with AIC's second contention, summary judgment is appropriate.

█ A court is free to assume that the plaintiff has established a prima facie case under *McDonnell Douglas* and proceed directly to whether he has adduced sufficient

evidence to raise a triable issue of pretext.[7] *See EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 149–50 (7th Cir.1996) (noting that a "court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a prima facie case," and "[t]o expedite the process it may be preferable to get past the prima facie case and examine the pertinent issue of whether there was discrimination in a job action"); *see also Sample v. Aldi, Inc.*, 61 F.3d 544, 548 (7th Cir.1995) (declining to address whether the plaintiff established a prima facie case because employer met its burden of articulating a non-discriminatory justification); *Porter v. State of Illinois DCFS*, 987 F.Supp. 667, 675 (N.D.Ill.1997) (where parties dispute satisfactory job performance, the court may assume that plaintiff has met his prima facie burden and advance to the ultimate issue of pretext). This is in line with the well-established principle that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

The Court finds that AIC has both produced admissible evidence of a nondiscriminatory reason for Hugley's termination—a violation of AIC written policies and regulations—and established its good faith belief in that reason. Two AIC supervisors, Ron Pushka from housekeeping and Personnel Director John Feery, received a complaint from Hall on November 16, 1995 that Hugley had threatened his life. To corroborate his complaint, Hall provided the names of potential witnesses. Subsequently, five AIC supervisors and administrators met to discuss what each knew about the incidents and initiated an investigation. As part of the investigation, DOPS Director Bob Koverman and DOPS supervisor Fred Venhuizen interviewed Hugley, Hall, Ellis and other AIC employees identified as potential witnesses, and obtained written statements that verified Hall's complaints. These statements included eyewitness testimony from AIC employee Bruce McGee, who claimed to have seen Hugley approach Hall in an angry, aggressive and hostile manner. In addition, Marion Ellis provided a written statement that she heard both confrontations between Hugley and Hall, including Hugley's alleged death threat in the afternoon encounter. Of particular significance is the undisputed fact that after hearing Hugley's own account of the incidents firsthand, Koverman documented in a memo that Hugley had said he was too angry to recall whether he had threatened Hall.

After reviewing the results of the investigation, Feery believed that the evidence sup-

---

**7.** Hugley strenuously argues that this Court must first assess his prima facie case so that he can establish that his job performance was satisfactory—aside from the alleged incident that led to his termination. He cites *Williams v. General Mills, Inc.*, 926 F.Supp. 1367 (N.D.Ill.1996), for the proposition that satisfactory work performance and the legitimacy of AIC's reason for termination should be analyzed as two separate issues in this case. To the extent *Williams* can be read to require the Court to address the plaintiff's prima facie case when the employer has articulated a nondiscriminatory justification for termination, it is inconsistent with well-established Seventh Circuit case law permitting us to advance to the ultimate issue in an employment discrimination summary judgment proceeding—pretext. *See, e.g., EEOC v. Our Lady of the Resurrection Medical Center*, 77 F.3d 145, 149–50 (7th Cir.1996).

Moreover, *Williams* ultimately granted summary judgment based on the plaintiff's failure to offer evidence of satisfactory job performance in support of his prima facie case. 926 F.Supp. at 1377. Likewise, Hugley has offered absolutely no evidence of his performance record. Therefore, even if we were to follow the *Williams* approach, Hugley's lack of evidentiary support for his assertions of satisfactory performance defeats his prima facie case. *See Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 865 (7th Cir.1996) (evidence of satisfactory performance must consist of more than plaintiff's own perceptions and testimony). Failure to satisfy the prima facie case elements alone warrants summary judgment in the employer's favor, *see Palmer v. Circuit Court of Cook Co.*, 905 F.Supp. 499, 506 (N.D.Ill. 1995) (summary disposition for failure to prove prima facie case) (citing *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 568 (7th Cir.1989)), *aff'd*, 117 F.3d 351 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 893, 139 L.Ed.2d 879 (1998); consequently, Hugley is not prejudiced by our decision to advance to the ultimate issue here.

ported Hall's complaint that Hugley had threatened him. Feery and Koverman agreed that Hugley should be terminated for violating AIC Rules and Regulations, which prohibit physically or verbally threatening another employee on pain of discharge. This was the same justification the AIC presented to the grievance committee reviewing Hugley's termination.

■ AIC's belief that Hugley threatened Hall, thereby violating AIC Rules and Regulations, is a legitimate, nondiscriminatory reason for Hugley's termination. *See Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 348 (7th Cir.1997) (violation of company rules and regulations constituted a legitimate, non-discriminatory reason for an employee's discharge); *see also Anderson v. Stauffer Chem. Co.,* 965 F.2d 397, 401 (7th Cir.1992) (poor performance and failure to get along with others constituted a legitimate, non-discriminatory reason for an employee's discharge). Hugley must now raise a genuine issue of fact as to whether this reason is merely a pretext for race discrimination. It is not sufficient for Hugley to show that the termination was unfair or undesirable; rather, Hugley must show that Koverman and Feery did not honestly believe that Hugley threatened Hall. *See Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 891 (7th Cir.1997); *see also Anderson,* 965 F.2d at 402 (as long as the defendant honestly believes that the employee is not meeting legitimate expectations, termination is justified).

■ Hugley first attempts to establish pretext by attacking the factual basis for AIC's justifications—i.e., Koverman's investigation into Hall's complaint that Hugley threatened him. Hugley claims that the investigation was both inadequate and biased, uncovering unreliable evidence and false accusations. In particular, Hugley attacks Marion Ellis' written statement, contending it was inconsistent with her deposition testimony[8] and with Hall's deposition testimony.[9] He also argues that Koverman interviewed Ellis using improper leading questions de-

signed to elicit a statement that Hugley threatened to "bust a cap" in Hall. Hugley contends that Koverman recorded the Q & A on Ellis' handwritten statement after the interview without showing the additions to Ellis or telling the grievance committee that he asked the questions in a leading manner—instead falsely representing to the committee that Ellis' statements were "unsolicited."

Hugley next attacks the thoroughness of Koverman's investigation in light of his education, training and experience. He points out that Koverman has a master of science in correctional administration and has received formal training in interrogation methods. This training and experience, Hugley maintains, should have prompted Koverman to verify the accuracy of Ellis' testimony by, for example, interviewing the worker whom Ellis was escorting at the time of the alleged threat—a "disinterested party" whose account would allegedly have conflicted with Ellis.' Hugley argues that Koverman's experience should also have prompted him to check Hall's personnel record, which reveals a previous write-up for using foul and abusive language. This, Hugley claims, would have led Koverman to question the veracity of Hall's complaint. According to Hugley, these steps would have been obvious to the experienced investigator; Koverman's failure to take them demonstrates his racial bias against Hugley.

Finally, Hugley points to the grievance committee hearing as proof that AIC did not honestly believe its reasons for terminating him. He attacks Hall's videotaped testimony, claiming it was altered to support AIC's version of events. At one point, the tape stops in mid-sentence and omits a few seconds' worth of sounds and images. Hugley asserts that the omitted testimony severely weakened his case, and complains that the individuals who could have explained to the grievance committee why and how the tape was edited—including Koverman—never did so. The manipulation of Hall's videotaped testimony and Ellis' written statement, both

**8.** Hugley is referring to a discrepancy between Ellis' written statement and her deposition testimony as to whether Hall shouted back at Hugley during the second confrontation.

**9.** *See supra* note 5.

key pieces of evidence before the committee, allegedly indicate that AIC knew that its evidence was tenuous and an insufficient basis for terminating Hugley.

 Hugley's contentions all miss the point. The issue here is not the adequacy of Koverman's investigation, the sufficiency of the evidence before the grievance committee, or even whether the alleged threat actually occurred. *See Kariotis v. Navistar International Transp. Corp.*, 131 F.3d 672, 677 (7th Cir.1997) (rejecting employee's attack on adequacy of employer's investigation and proof used to support her discharge because "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination") (internal quotations and citations omitted); *Bagnell v. Komatsu Dresser Co.*, 838 F.Supp. 1279, 1285 (N.D.Ill.1993) (rejecting employee's efforts to challenge employer's investigation because "our inquiry in this case is not whether the alleged acts actually occurred. Rather, our inquiry is limited to whether the employer's belief was honestly held."). It is not appropriate for this Court to evaluate the investigations and hearings surrounding Hugley's termination because we do "not sit as a super-personnel department that re-examines an entity's business decisions." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992) (citations omitted). Nor is our role to determine if Hugley was treated fairly during the investigatory or grievance proceedings, unless he can show treatment different from others outside his protected class. *See Kariotis*, 131 F.3d at 677. "It is well settled in [the Seventh Circuit] and other circuits that an employer may terminate an employee for any reason, good or bad, or for no reason at all, as long as the employer's reason is not proscribed by a Congressional statute." *Kahn v. United States Sec. of Labor*, 64 F.3d 271, 279 (7th Cir.1995). "In short, [n]o federal rule requires just cause for discharges."[10] *Kariotis*, 131 F.3d at 677.

The Seventh Circuit's opinion in *Kariotis* addressed arguments nearly identical to Hugley's. Kariotis sued her employer for age discrimination after being terminated for committing disability fraud. The company conducted an investigation before firing her, but Kariotis argued that the investigation was "imprudent, ill-informed, and inaccurate," and therefore a pretext for discharging her because of her age. *Id.* at 677. Among other things, the employer failed to confirm Kariotis' medical condition with her doctor; instead, it relied the reports of private investigators—who were not medical experts— that their secret videotapes of Kariotis' off-duty activities showed she was not disabled. Nor did the employer obtain a second opinion by having its own doctor examine Kariotis. By failing to seek out any objective evaluation of plaintiff's condition, Kariotis argued, her employer turned a blind eye to evidence that may have confirmed her disability.

The court agreed that the investigation left something to be desired. *Id.* at 677–78. But it held that attacking the adequacy of an employer's investigation into employee misconduct is merely "a distraction" from the issue of pretext. *Id.* at 677. "[T]he question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." *Id.* (internal quotations and citations omitted). The investigation, however shoddy, was the reason given for Kariotis' termination; Kariotis was required to challenge the honesty of this description, not simply attack the method or results of the investigation. *Id.; see also Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir.1997) (accuracy of employer's assessment is not relevant to pretext); *Gustovich v. AT & T Communications*, 972 F.2d 845, 848 (7th Cir.1992) (the question is not whether the employer's reasons for a decision are right, but whether the employer's description of its reasons is honest); *McCoy v. WGN Continental Broadcasting*, 957 F.2d 368, 373 (7th Cir.1992) ("[T]he issue of pre-

10. The exception, of course, is where the employee can demonstrate a constitutional property interest in his job—a showing that Hugley cannot make here. An employee retains a property interest in his job when independent sources, such as a law or implied contract, confer a legitimate claim of entitlement to continued employment. Only then must there be just cause or due process of law before termination. *See Brownlee v. City of Chicago*, 983 F.Supp. 776, 780 (N.D.Ill. 1997).

text does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers."); *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir.1987) ("[A] reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination."). Unless Kariotis presented "facts suggesting that the company investigated her differently" because of a protected characteristic, her attack on the company's decisional process was futile.[11] 131 F.3d at 677.

As in *Kariotis,* the undisputed facts in this case establish that AIC honestly described its reasons for Hugley's discharge. Hugley's threat against Hall was the focal point of AIC's investigation and the same termination justification that the AIC presented to the grievance committee. Hugley's pretext argument does not refute these points; instead, it is largely devoted to contending that his termination lacked a factual basis because AIC did not adequately substantiate Hall's allegations. We reject Hugley's invitation to second-guess AIC's reliance on its administrators' investigations, which, in any event, did have some factual basis—Hall's complaints to Pushka and Feery and his offering of corroborating witnesses. But even if Hugley were right that he did not threaten Hall and that Hall's version of events was entirely uncorroborated, AIC was still free to terminate Hugley at will as long as the termination was free of any illicit discrimination. Hugley does not have any evidence of illicit discrimination; he does not show, for example, that AIC either investigated his case or presented it to the grievance committee any differently than it would have (or did) a non-black employee's case. As such, he fails to meet the narrow exception that *Kariotis* delineated for allowing some analysis of the employer's decisional processes.

Hugley's attempt to show a discriminatory difference in treatment from a non-black employee, Mr. K., likewise has no merit. Mr. K

made threatening statements during an AIC employee stress seminar, but was not terminated. Instead, he was placed on leave and reinstated once he successfully completed medical treatment. Contrary to Hugley's assertions, Mr. K.'s more lenient sanction is well-supported by the record—mitigating circumstances distinguish Mr. K.'s conduct from Hugley's. Unlike Hugley, Mr. K. made his "threat" in a controlled, therapeutic environment, not on the job during the workday. Indeed, it was only after encouragement from a clinical psychologist that Mr. K. vocalized his feelings of stress and frustration. Moreover, Mr. K's threat was not made directly to his fellow employee(s). In short, Hugely cannot show pretext through the difference in treatment between him and Mr. K. because Mr. K.'s misconduct is not of comparable severity.

We must grant summary judgment to AIC on Hugley's race discrimination claims because Hugley has failed to cast doubt on the credibility of AIC's reason for his termination. The mosaic of undisputed facts, when viewed in their entirety, would not permit a reasonable jury to find unlawful discrimination.

**B. Defamation**

■ By granting summary judgment on Hugley's discrimination claims (Count I), we have dismissed the only count supporting federal jurisdiction. Using our discretion, we decline to exercise supplemental jurisdiction over Hugley's remaining state law claims for defamation. We find that considerations of judicial economy, convenience, fairness, and comity point toward permitting their resolution in state court. *See Timm v. Mead Corp.*, 32 F.3d 273, 276–77 (7th Cir.1994) (outlining courts' considerations in determining whether to exercise supplemental jurisdiction); *Ragland v. Rock–Tenn Co.*, 955 F.Supp. 1009, 1023 (N.D.Ill.1997) (exercising discretion to decline supplemental jurisdiction over plaintiff's state law claims after disposing of federal employment discrimina-

---

**11.** The Supreme Court has also recognized that departures from normal decisionmaking procedures can be evidence of discriminatory intent, particularly if the procedures usually followed by the decisionmakers strongly favor a decision contrary to the one reached. *See Village of Arlington*

*Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Hugley, however, does not claim that AIC failed to follow its own policies and procedures during the investigation or grievance committee hearing.

tion claim). Accordingly, we dismiss Hugley's state law claims without prejudice to his refiling them in state court.

## CONCLUSION

It is unfortunate that this incident, which seems to have been driven by Hugley's good intentions to protect his wife, has cost him his job at AIC. But Hugley simply has not met his burden of proof; the undisputed facts establish that AIC honestly believed that Hugley had violated its rules and regulations. Although Hugley may be correct that the investigation and hearing could have been conducted in a fairer manner, it is sufficient that AIC was sincere in its proffered reason. Federal law does not require an employer to prove cause for terminating an at-will employee, *see Brownlee v. City of Chicago*, 983 F.Supp. 776 (N.D.Ill.1997), much less undergo a prudent, accurate, and thorough investigation of the circumstances surrounding employee misconduct that ultimately results in discharge.

Since we have concluded that no reasonable jury could find that Hugley was discriminated against because of his race, we must grant the Defendant's Motion for Summary Judgment on Hugley's Title VII and 42 U.S.C. § 1981 claims (Count I). Exercising our discretion to relinquish supplemental jurisdiction, we dismiss Hugley's state-law defamation claim (Count II). Hugley may file this claim in state court if he chooses.