**Louis SIDNEY, Plaintiff,**

**HUMANA HEALTH CARE PLAN, INC., Defendant.**

**No. 97 C 4418.**

United States District Court, N.D. Illinois, Eastern Division.

July 21, 1998.

Oscar Enrique Romero, Abrahamson Vorachek & Mikva, Chicago, Kelly A. Lonnberg, Kevin S. Kinkade, O'Leary & Associates, Oakland City, IN, for Plaintiff.

Michael G. Cleveland, Paula Kay DeAngelo, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for Defendant.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

Plaintiff Louis Sidney filed suit in this Court alleging that his former employer, Humana Health Care Plan, Inc. ("Humana"), discriminated against him on the basis of his race. Humana terminated Sidney following its investigation of another employee's claim that Sidney held a scissors to her throat. Count I of Sidney's complaint alleges that his termination violated 42 U.S.C. § 1981. Count II claims that his termination violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Humana has moved for summary judgment on both counts. For the reasons that follow, we grant Humana's motion.

### RELEVANT FACTS [1]

On August 29, 1988, the Michael Reese Health Plan hired Sidney as the Chief Tech-

1. The facts are derived from the parties' Local Rule 12(M)-(N) statements of fact and accompanying exhibits.

nician of the Diagnostics Department at its Evanston, Illinois center. Def.'s Facts ¶ 3. Sidney continued to hold his position as Chief Technician after Humana, a nationwide health maintenance organization, acquired the Michael Reese Health Plan in 1991. *Id.* at ¶¶ 1–3. As the Chief Technician, Sidney directed the operations of the Diagnostic Department, which encompassed the radiology, laboratory, and EKG areas, and supervised the Department's employees, including radiology technicians. *Id.* at ¶ 4. Sidney reported to Center Manager Pat Duez, who in turn reported to Timothy Yusk, the Regional Administrative Director since 1994. *Id.* at ¶ 5; Pl.'s Add'l Facts ¶ 1. Sidney was the only black male supervisor at Humana's Evanston facility. Pl.'s Add'l Facts ¶ 2.

In May 1995, Lori Eaton, a radiology technician under Sidney's supervision, complained to Duez that Sidney had asked female employees to lift their lab coats.[2] Pl.'s Add'l Facts ¶ 3. Eaton made this complaint during a meeting about the Employee Improvement Program that Sidney had designed to correct deficiencies in Eaton's work performance. *Id.* Upon learning about Eaton's complaint, Yusk and Shari Swartz (then Manager of Employee Relations) investigated the allegation by speaking with several employees. Def.'s Facts ¶ 10. Although the investigation did not confirm Eaton's allegation, it revealed evidence of other improper behavior. *Id.* at ¶ 11. Specifically, two employees independently informed Yusk and Swartz that Sidney had created an uncomfortable working environment by making comments about female employees' clothing and appearance, standing in close proximity to female employees, and using objects as an extension of touch when interacting with them. *Id;* Yusk Dep. 22–24.

Upon the conclusion of his investigation, Yusk determined Sidney's conduct to be inappropriate and issued Sidney a written warning on July 7, 1995, stating that "any further incidents of improper conduct will result in further disciplinary action up to and including termination of employment." *Id.* at ¶ 12; Yusk Aff., Ex. 1. Yusk never revealed to Sidney that Eaton was the employee who initiated the complaint against him. Sidney testified that Yusk told him that this write-up would remain in his file for one year and then would be discarded. Pl.'s Add'l Facts ¶ 7; Sidney Dep. 44.

By 1996, Humana had replaced Pat Duez with new Center Manager Ann Scheid. Scheid and Sidney worked well together. Unfortunately, the same cannot be said about Sidney's relationship with Eaton. Sidney issued Eaton an employee consultation in February 1996 for her absenteeism. Pl.'s Add'l Facts ¶ 11; Ex. 7. A month later, a patient complained that Eaton was rude and Sidney warned Eaton that she would be disciplined if her unacceptable behavior continued. Pl.'s Add'l Facts ¶ 12. Additionally, in March 1996, Sidney instituted a plan, with Shmid's approval, which required each technician to perform a mammogram every twenty minutes. Pl.'s Add'l Facts ¶ 13. This plan significantly increased the technicians' workload, much to the dismay of Eaton and other technicians. *Id.*

On June 4, 1996, Schmid told Yusk that Judy Sandler, a radiology technician under Sidney's supervision, had complained that Sidney had approached her from behind, reached over her right shoulder, and pointed scissors at her throat. *Id.* at ¶ 13. Schmid also told Yusk that although she had spoken with Sidney and asked him to apologize to Sandler, Sandler had submitted an Occurrence Report and thus an investigation would have to be conducted. *Id.* at ¶ 14. Yusk was concerned about Sandler's allegation and Schmid's failure to report the incident earlier. *Id.* at ¶ 15.

Humana's Discipline Guidelines state that immediate termination may be justified if an employee engages in a "critical offense" and that an employee should be suspended pending the outcome of an investigation by management. *Id.* at ¶¶ 6, 8. The Guidelines list "[t]hreatening, intimidating, or coercing patients, customers, employees, or others" and "negligent or willful acts, or conduct detrimental to patient care, customer service, employees, or facility operations" as examples of

---

**2.** Humana has challenged a number of the statements in Sidney's Rule 12(N) statement of facts as being hearsay and/or purely argumentative.

This Court has relied upon only those factual assertions supported by admissible evidence.

misconduct which constitute critical offenses. *Id.* at ¶ 7. Yusk, Narin Trent (Assistant Executive Director of Human Resources), and Desiree Thompson (then Employee Relations Specialist) agreed that because Sidney was alleged to have committed a critical offense—threatening an employee—he should be suspended immediately pending an investigation. *Id.* at ¶¶ 16–17. At Yusk's direction, Schmid suspended Sidney on June 5, 1996, explaining that Sandler had reported that Sidney had approached her in a physically threatening manner. *Id.* at ¶¶ 18–19.

Yusk and Thompson began an investigation the following day. *Id.* at ¶ 20. They spoke first with Sandler, who informed them that on May 28, 1996, she and Eaton had been talking with Sidney in a file room about a problem with a mammogram that she had performed when Sidney approached her from behind, reached over her right shoulder, and pointed scissors at her throat. *Id.* at ¶ 21. Sandler also said that when Eaton called Sidney's name, Sandler asked Sidney whether he was threatening her and that Sidney then left the room. *Id.* Finally, Sandler told Yusk and Thompson that she immediately reported the incident to Schmid that same day (May 28), but when nothing was done, she submitted the Occurrence Report on May 31 on the advice of her attorney. *Id.* at ¶ 22. Eaton confirmed Sandler's explanation of the May 28 incident. *Id.* at ¶ 23. Moreover, Sandler and Eaton submitted written statements which coincided with their oral accounts of the incident. *Id.* at ¶ 24.

Subsequently, Yusk reviewed a written statement submitted by Sidney at Yusk's request. *Id.* at ¶ 25. In his statement, Sidney described the incident as occurring on May 31 (rather than May 28) while Sandler, Eaton, and he had been in the file room discussing an unread mammogram performed by Sandler that was returned by an Evanston Hospital radiologist. *Id.* at ¶ 26. Specifically, Sidney stated that:

On Friday May 31, 1996, at approximately 4:45 p.m., Judy Sandler, Lori Eaton and I were talking in the file room. It was the end of a busy day. The topic of conversation was an unread mammogram that was returned from Evanston Hosp. Judy was upset because it was a mammogram which she had done. We discussed the fact that Radiologists don't always follow their own protocol regarding returned mammogram [sic]. I told Judy not to worry in that the mammogram could be resubmitted. It was obvious that Judy was disturbed because she had put a great deal of effort into producing a good mammogram. *To lighten the mood, I picked up a pair of scissors and with my fingers over the blades, I reached over Judy's shoulder and said "those radiologists."* My actions were misinterpreted by Lori Eaton, who said, "Lou is going to stab you." I immediately said, "you must be kidding." Judy had a surprised look on her face but did not appear angry. Lori and Judy began whispering as I left the room. It was the end of a busy day and for a brief moment I compromised myself.... I feel that a three day suspension is unfair, but I do realize that disciplinary action may be required.

Def's Ex. E. (emphasis added).

Sidney later testified that before the incident with Sandler, he had already been holding scissors in his hand because he was cutting the front of an old X-ray envelope so that he could paste it to a new ·envelope. Pl.'s Add'l Facts ¶ 14. Further, he testified that he left the room because he was frightened by the look of hatred in Eaton's eyes when she stated to Sandler, "Lou is going to stab you." Def.'s Resp. Add'l Facts ¶¶ 18–19. Finally, Sidney added that he felt compromised when he realized that he was in a room with two people who wanted to harm him. Pl.'s Add'l Facts ¶ 21. Humana highlights the manner in which this explanation apparently contradicts his previous written statement confessing that "for a brief moment, I compromised himself." Def.'s Resp. Add'l Facts ¶ 21.

Yusk, Thompson, and Trent deemed Sidney's written statement to be an admission that Sidney had placed a sharp object in the vicinity of Sandler's body. *Id.* at ¶ 28. Based on this admission, Sandler's and Eaton's statements about the incident, and Sidney's prior written warning, Yusk, Thompson, and Trent decided that Sidney should be discharged for committing a critical offense. *Id.* at ¶ 29. Yusk admitted that Sidney's

intent to threaten Sandler was not a factor in the decision to terminate him. Yusk Dep. 18. Thompson explained that it was the employee's perception, not Sidney's intent, that was critical to their determination. Accordingly, Sidney was terminated on June 11, 1996. *Id.* at ¶ 30. Thereafter, Sidney appealed his discharge through Humana's internal grievance procedure. But the discharge decision was upheld at each stage of the grievance procedure by three separate reviewers. *Id.* at ¶ 31.

Similarly, Yusk also discharged Schmid (a white employee) on June 13, 1996 in connection with the incident. *Id.* at ¶ 34. After Yusk learned that Sandler had reported the incident to Schmid on May 28, but Schmid had failed to take any action until June 4, he suspended Schmid pending an investigation. *Id.* at ¶ 32. Although Schmid and Sidney contended that the incident occurred on May 31 and was reported to her that day, Yusk concluded from his investigation that it had occurred and was reported on May 28. *Id.* at ¶ 33. Thus, Yusk determined that Schmid should be discharged for committing a critical offense by failing to take immediate and appropriate action in response to a serious allegation by an employee. *Id.* at ¶ 34. After her discharge, Schmid filed a grievance, asked to resign, and was permitted to do so. *Id.* at ¶ 35. Humana points out that Sidney never asked to resign.[3] *Id.* at ¶ 36.

Dr. Ernest Weis, Vice President and Medical Director of Humana, received Sidney's file as part of Humana's internal grievance procedure. Dr. Weis wrote to Thompson in October 1996, expressing his concern with the decision to terminate Sidney given the information he had received and that the eyewitness account corroborating the complaint came from Eaton, who may have had a motive to lie since she had received a negative review by Sidney. Pl.'s Add'l Facts ¶ 41. Thompson responded to Dr. Weis's note by providing him with additional information, including the July 7, 1995 report documenting Sidney's written warning for improper conduct. Def.'s Resp. Add'l Facts ¶ 42. Thompson also explained that Sidney had "produced a written statement which indicated his intent to lighten the mood, rather than do bodily harm . . . . While he may not have

had malicious intent, it was not only inappropriate, but we know the incident upset the employee such that she kept a log of the events, reported the incident to the center manager, and filed an incident report." Dr. Weis replied that he now supported the decision to terminate. *Id.* at ¶ 43.

## ANALYSIS

### A. Summary Judgment Standards

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the non-moving party, and draw all inferences in the non-movant's favor. *See Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). But if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Unterreiner v. Volkswagen, Inc.,* 8 F.3d 1206, 1212 (7th Cir.1993).

In ascertaining whether a genuine issue of material fact exists, the court must "view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. 2505. If the "record taken as a whole could not lead the trier of fact to find for the non-moving party, there is no genuine issue of material fact for trial." *See Matsushita Elec. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, this Court's sole duty is to determine whether sufficient evidence exists to support a verdict in the non-movant's favor; credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of the judge deciding a motion for summary judg-

---

**3.** Sandler resigned from Humana on September 27, 1996. Def.'s Resp. Add'l Facts ¶ 44.

ment. *See Liberty Lobby,* 477 U .S. at 255, 106 S.Ct. 2505. These standards apply with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir.1994); *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993).

## B. Race Discrimination

### 1. Prima Facie Case

■ Both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 prohibit employers from discriminating against their employees on the basis of race. *See Oates v. Discovery Zone,* 116 F.3d 1161, 1169 (7th Cir.1997). Under both statutes, Sidney bears the ultimate burden of proving that his employment was adversely affected by his race; he may sustain that burden with either direct or circumstantial evidence of discriminatory intent. *Id.* at 1169–70; *see Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). When, as in Sidney's case, there is no direct evidence of discrimination, the most common way to prove employment discrimination circumstantially is "by way of the burden-shifting approach first articulated in *McDonnell Douglas Corp.* [*v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ]." *O'Connor v. DePaul Univ.,* 123 F.3d 665, 669 (7th Cir.1997). To make out a prima facie case of race discrimination using the *McDonnell Douglas* method, Sidney must establish that (1) he is within a protected racial class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he has evidence from which it can be inferred that the adverse action sprang from a "legally forbidden ground," for example, more favorable treatment of similarly situated non-black employees. *See Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 158–59 (7th Cir.

1996); *Ali v. Brown,* 998 F.Supp. 917, 1998 WL 136227, at *8 (N.D.Ill. Mar.23, 1998).

■ If Sidney succeeds in making a prima facie showing of discrimination, a rebuttable presumption of discrimination arises and the burden of production shifts to Humana to articulate a legitimate, non-discriminatory reason for terminating Sidney. *See Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If Humana is successful, the presumption dissolves and the burden of production shifts to Sidney to show that the proffered reason is a pretext for discrimination. *Id.* at 256, 101 S.Ct. 1089. Pretext can be established by showing (1) that discriminatory intent more likely than not motivated the employer; or (2) that "the employer's proffered explanation is unworthy of credence" because the defendant's explanation had no basis in fact, was not the real reason for the adverse action, or was insufficient to justify any adverse action. *See Collier v. Budd Co.,* 66 F.3d 886, 892 (7th Cir.1995); *Lenoir v. Roll Coater,* 13 F.3d 1130, 1133 (7th Cir. 1994).

■ Humana offers two alternate grounds in support of its motion for summary judgment on the discrimination claims. First, it argues that Sidney cannot satisfy the second and fourth prongs of his prima facie case. It contends that Sidney did not meet Humana's legitimate expectation because he committed a critical offense, and that Sidney cannot point to any similarly situated employee outside his race who was treated more favorably. Second, Humana argues that even if Sidney has established a prima facie case, he has not produced evidence from which a reasonable fact finder could infer that Humana's proffered reason for his termination was a pretext for discrimination. Because we agree with Humana's second contention, summary judgment is appropriate.[4]

---

4. A court is free to assume that the plaintiff has established a prima facie case under *McDonnell Douglas* and proceed directly to whether he has adduced sufficient evidence to raise a triable issue of pretext. *See EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149–50 (7th Cir.1996) (noting that a "court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a prima facie case," and "[t]o expedite the process

it may be preferable to get past the prima facie case and examine the pertinent issue of whether there was discrimination in a job action"). This is in line with the well-established principle that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

## 2. Pretext

■ Humana has articulated a legitimate, nondiscriminatory reason for discharging Sidney—the allegation and conclusion that he held scissors to the throat of another employee. The defendant interviewed both the complaining employee and an eyewitness, and requested written statements documenting their versions of the incident. Their oral and written testimony were consistent. More importantly, Sidney's own written statement describing the event—while denying malicious intent—could be readily interpreted as an admission to the charges.[5]

Humana's Guidelines list threatening and intimidating behavior as a critical offense, and provide that persons committing critical offenses are subject to disciplinary action, including termination. In addition, Yusk had issued Sidney a written warning a year earlier, informing Sidney that "any further incidents of improper conduct will result in further disciplinary action up to and including termination." As a result of Sander's complaint, the defendant's investigation, and Sidney's prior warning, Humana terminated Sidney. Further bolstering the credibility of their explanation for Sidney's termination, Humana argues, is the fact that Schmid, who is white, was also terminated as a result of this incident, and that one of the decisionmakers, Trent, was black. *See Rooks v. Girl Scouts of Chicago,* 1995 WL 562126, at *7 (N.D.Ill. Sept.21, 1995), *aff'd,* 95 F.3d 1154 (7th Cir.1996).

Nevertheless, Sidney contends that the real reason he was terminated was racial animus. In support of this assertion, Sidney explains that 1) he never intended to threaten Sanders; 2) Humana's reliance upon his prior offense was inappropriate because the 1995 charge was instigated by Eaton and was not proven to be true[6]; 3) Yusk's decision not to request Sidney's version of the events until after Yusk interviewed his accusers and after Sidney was terminated was unfair; 4) Schmid, not Yusk, should have conducted the investigation and would not have recommended his termination; and 5) Humana's reliance upon Eaton and Sandler's statements was improper because these employees were predisposed against him.

■ Sidney's attacks on Humana's proffered explanation can be categorized as a general challenge to the fairness of the investigation and Humana's conclusion. However, "[n]o federal rule requires just cause for discharges" or guarantees an employee a flawless investigation. *Kariotis v. Navistar Int'l Corp.,* 131 F.3d 672, 677 (7th Cir.1997). As this Court and the Seventh Circuit have previously explained, it is not the employer's investigation which comes under scrutiny, but whether the employer honestly described its reasons for discharging the plaintiff that is relevant. *Id.* (finding that the plaintiff's energy in attacking the employer's investigation was "misspent . . . unless she could point to facts suggesting that the company investigated her differently because [of her protected status]"); *Hugley v. Art Institute of Chicago,* 1998 WL 234178, at *8 (N.D.Ill. Apr.24, 1998). Mindful of the three levels of review Humana to which Yusk's termination decision was subjected, we note that this Court does not:

> sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices,

---

5. After filing his lawsuit, Sidney testified that his written statement in no way constituted an admission to Sandler's charge. Sidney points out that while he admitted that "I picked up a pair of scissors and with my fingers over the blades, I reached over Judy's shoulder, he never said that he reached over Judy's shoulder with the hand that was holding the scissors." On the contrary, Sidney argues, the scissors were in the other hand, held away from Judy. However, Sidney does not even argue that the defendant should have reasonably interpreted his written statement in this manner, nor does he allege that he informed Humana (prior to filing this lawsuit) that his written statement was susceptible to another interpretation.

6. Sidney's arguments regarding Eaton's 1995 complaint and Humana's reliance upon Eaton's corroboration of Sandler's complaint border on offensive. While they are rooted in his contention that her past behavior renders her incredible, his arguments suggest that Humana should be inherently suspicious of complaints lodged by "young white females" against black males. Moreover, they ignore the fact that while Eaton's 1995 complaint was determined to be unfounded, the warning was issued based upon other female employees' complaints about Sidney's behavior.

no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the federal antidiscrimination laws do] not interfere. Rather, inquiry is limited to whether the employer gave an honest explanation for its behavior.

*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992).

Sidney has failed to demonstrate that the defendant did not honestly believe that he committed a critical offense. *See Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 891 (7th Cir.1997); *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir.1992) (if the employer honestly believed that the employee was not meeting legitimate expectations, termination is justified). Sidney's contention that Humana was wrong in finding that he committed a critical offense does not cast doubt upon their motivations. *Gustovich v. AT & T Communications*, 972 F.2d 845, 848 (7th Cir.1992) (the question is not whether the employer's reasons for a decision are right, but whether the employer's description of its reasons is honest).

Moreover, while Sidney offers varying accounts of when he picked up the scissors, where he held the scissors, and whether he was compromised or compromised himself, he does not dispute that the incident actually happened. Rather, he contends that Humana's unfair investigation led to the improper conclusion that he threatened Sandler. *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir.1987) ("a reason honestly believed but poorly founded is not a pretext."). However, it is clear that regardless of what Sidney intended, Humana believed that, as a supervisor, Sidney had acted inappropriately and that Sanders, mistaken or not, was clearly upset as a result of the incident. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 338 (7th Cir. 1991) (employee "must do more than challenge the judgment of his superiors through his own self-interested assertions.") Humana then concluded that Sidney had committed a critical offense and discharged him in accordance with their Guidelines. *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir.1989) (concluding that an employer can set whatever performance standards it chooses.) Accordingly, we find that no reasonable trier of fact could conclude that Sid-

ney's arguments reveal that Humana's proffered explanation had no basis in fact, was not the real reason for the adverse action, or was insufficient to justify any adverse action.

■ Sidney raises one argument that cannot be readily categorized with the others. Sidney contends that he has shown discriminatory intent because two white employees—Sue Parr and Ron Brown—committed similarly serious offense but were not discharged. A review of these two incidents, however, reveals little similarity to the charge against Sidney. In January 1996, a patient alleged that technician Ron Brown fondled himself while x-raying the patient. Def.'s Facts ¶ 37. After an investigation, Humana found no evidence substantiating the allegation that Brown had committed a critical offense; consequently, Brown was not terminated. *Id.* at ¶ 38. In April 1996, nurse Sue Parr was alleged to have breached employee confidentiality by discussing why another employee needed time off from work. *Id.* at ¶ 39. After an investigation, Humana found no evidence substantiating the allegation that Parr had committed a critical offense; consequently, Parr was not terminated. *Id.* at ¶ 40. Parr, however, was suspended for using poor judgment and failing to pay attention to details. Def.'s Resp. Add'l Facts ¶ 26; Yusk Aff. ¶ 25.

Unlike the investigation into Brown or Parr's offenses, Humana's investigation produced both an eye-witness and Sidney's own statement corroborating the complainants's claim. Unlike Brown or Parr, the conduct Sidney was charged with involved physically threatening behavior. We find that Brown and Parr's infractions do not rise to the level of seriousness associated with Sidney's offense. *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770–71 (7th Cir.1994) (finding that an employee guilty of alcohol-related offenses is not similarly situated to employee accused of falsifying records). More importantly, Sidney has not directed us to any evidence that Humana considered the offenses to be similarly severe. *Plair v. E.J. Brach & Sons, Inc.*, 931 F.Supp. 555, 564 (N.D.Ill.1995), *aff'd*, 105 F.3d 343 (7th Cir.1997) (stating that "it is not the court's proper role to assess the relative seriousness of infractions

of an employer's rules and decide whether the employer's responses are commensurate.") Therefore, we can conclude only that Sidney has failed to cast any doubt upon the credibility of Human's reason for terminating him.

## CONCLUSION

Drawing all inferences in favor of the plaintiff, we find that Louis Sidney has demonstrated that Humana employs a low-tolerance attitude toward employee infractions. While this Court might be reluctant to terminate a valued employee based upon what may have been a genuine misunderstanding, Humana's decision to do so does not violate § 1981 or Title VII. There is simply no evidence in the record that racial animus motivated Humana's seemingly hard-line position. Accordingly, Humana's motion for summary judgment is granted.